**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **DONALD M. MARTIN,** | CASE NO. 5:11CV2230 |
| Petitioner, | JUDGE JOHN R. ADAMS |
| v. | MAGISTRATE JUDGE GREG WHITE |
| **WARDEN,**[1] **Richland Correctional Institution,** | |
| Respondent. | **REPORT AND RECOMMENDATION** |

Petitioner, Donald M. Martin ("Martin"), challenges the constitutionality of his conviction in the case of *State v. Martin*, Summit County Court of Common Pleas Case No. CR-2008-10-3210 A.  Martin, *pro se*, filed his Petition for a Writ of Habeas Corpus (ECF No. 1) pursuant to 28 U.S.C. § 2254 on October 19, 2011.  On February 17, 2012, Warden Maggie Bradshaw ("Respondent") filed her Answer/Return of Writ.  (ECF No. 6.)  Martin filed a Traverse on June 14, 2012.  (ECF No. 11.)  For reasons set forth in detail below, it is recommended that Martin's petition be DENIED.

### I. Summary of Facts

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, factual determinations made by state courts are presumed correct.  28 U.S.C. § 2254(e)(1); *see also House v. Bell,* 283 F.3d 37 (6th Cir. 2002).  The state appellate court summarized the facts underlying Martin's conviction as follows:

> {¶ 1} Donald Martin grew marijuana in his basement. Police discovered the marijuana while they were performing a protective sweep in response to a reported burglary in process. They approached Mr. Martin and asked permission to search his house, which he granted. They discovered, in addition to the marijuana, cocaine and firearms. The trial court denied Mr. Martin's motion to suppress, and he pleaded no contest to trafficking in cocaine and having weapons

---

[1]Maggie Bradshaw is the Warden at the Richland Correctional Institution where Martin is currently incarcerated.  Therefore, Bradshaw is the proper party Respondent.

under disability. The trial court sentenced him to four years imprisonment. We affirm the trial court's judgment because the search of Mr. Martin's home was not unconstitutional and the trial court did not err by denying his motion to suppress.

{¶ 2} Tavio Kelker, Mr. Martin's teenage stepson, was running late for school when he heard a man trying to get in the backdoor. Because he was home alone, he called his mother to ask her to call Mr. Martin and the police. He testified that the burglar seemed to give up and leave, so he went upstairs to get ready for school.

{¶ 3} Mr. Kelker then heard someone "breaking out the window." He ran to investigate and saw a man at the broken window. He called his mother again, set the house alarm, and grabbed a bat. When the man started to come through the window, he smashed the bat against the pane, scaring the burglar off.

{¶ 4} Mr. Kelker testified that he then purposefully set off the alarm and waited for the police to come. When the police arrived, they called out, asking if anyone was in the house. Mr. Kelker responded by identifying himself and saying that he lived there. He came outside holding the baseball bat and the phone. The officers patted him down, handcuffed him, and put him in the squad car. They asked him if anyone else was in the house. He told them that he was the only one home and that the man who had attempted to break in had fled.

{¶ 5} Sergeant Matthew Sunkin testified that he responded to a call of a burglary in progress with a shot fired, which he interpreted as "a botched home invasion." He also received a report of a man fleeing the scene. As he approached the house, he observed a broken window. He testified that the damage appeared to have been caused by a bullet fired from inside the house as there was glass outside and the screen had been damaged.

{¶ 6} Sergeant Sunkin went around to the front of the house and saw the officers speaking to Mr. Kelker. Without talking to them, he went in the house with Officer Jackson to conduct a protective sweep. They cleared the downstairs, the upstairs, and proceeded to the basement. Sergeant Sunkin testified that, as he went down the stairs, he noticed a bright light coming from an enclosure in front of him that was large enough for multiple people to be inside. He and Officer Jackson cleared the rest of the basement before returning to the enclosure. Sergeant Sunkin testified that he noticed that there was a padlock on a door of the enclosure and an exhaust fan. He also smelled marijuana. Sergeant Sunkin testified that, based on his experience, "[i]t was pretty obvious ... that it was a marijuana cultivation operation."

{¶ 7} Sergeant Sunkin had Officer Jackson look inside the enclosure through a gap in the door to make sure no one was there. Officer Jackson only saw plants, so he and Sergeant Sunkin left the basement, having secured the house. Sergeant Sunkin relayed to Detective Matthew Hudak what he had seen.

{¶ 8} Mr. Martin testified that, when he arrived at his house, Detective Hudak approached him and asked for consent to search the house. He testified that Detective Hudak threatened to get a warrant and charge his fiancée with whatever the police found if he would not consent to a search. Detective Hudak denied he

2

> had threatened Mr. Martin. Detective Hudak testified that he read the written consent form to Mr. Martin, told him that his consent could be withdrawn at any time, that he could accompany the officers as they searched the house, and that a police dog would participate in the search. Mr. Martin signed the consent form and gave the police the combination for the padlock on the enclosure in the basement. The police removed the plants from the enclosure. A search of the rest of the house and Mr. Martin's vehicle revealed cocaine and firearms.

*State v. Martin*, 2011 WL 2021913, *1-2 (Ohio App. 9th Dist. May 18, 2011).

## II. Procedural History

### A. Conviction

On October 9, 2008, a Summit County Grand Jury charged Martin with two counts of Possession of Cocaine in violation of Ohio Revised Code ("O.R.C.") § 2925.11(A)(C), two counts of Trafficking in Cocaine in violation of O.R.C. § 2925.03(A)(C)(4), one count of Trafficking in Marijuana in violation of O.R.C. § 2925.03(A)(C)(3), four counts of Having Weapons While Under Disability in violation of O.R.C. § 2923.13(A)(3), one count of Possessing a Defaced Firearm in violation of O.R.C. § 2923.201(A)(2), one count of Illegal Use of Possession of Drug Paraphernalia in violation of O.R.C. § 2925.14(C)(1), one count of Illegal Cultivation of Marijuana in violation of O.R.C. § 2925.04(A), and one count of Permitting Drug Abuse in violation of O.R.C. § 2925.13(B)/(C)(3).  (ECF No. 6-1, Exh. 1.)

On November 5, 2008, Martin moved to suppress the fruits of the search.  *Id.*, Exh. 3.  A hearing was held, evidence was presented, and on February 17, 2009, the motion was denied. *Id.*, Exh. 4.  On March 26, 2009, Martin entered a plea of no contest to one count each of Trafficking in Cocaine with criminal forfeiture specification and Having Weapons While Under Disability.  The balance of the indictment was dismissed.  The trial court, in a Journal Entry dated March 26, 2009, and filed April 1, 2009, sentenced Martin to a prison term of 4 years.[2]  *Id.*,

---

[2]The Summit County Clerk of Courts website indicates that on June 18, 2012, Martin was released from prison and placed on community control. *See* http://www.cpclerk.co.summit.oh.us. Case No. CR-2008-10-3210 A. (viewed on July 6, 2012).  Nonetheless, because Martin was sentenced to a five-year term of post-release control, the case is properly before this Court.  The Supreme Court's "interpretation of the 'in custody' language has not required that a prisoner be physically confined in order to challenge his sentence on habeas corpus." *Maleng v. Cook*, 490 U.S. 488, 490, 109 S.Ct. 1923, 104 L.Ed.2d 540 (1989).  "[T]he actual or potential restraint on

Exh. 5.

**B.  Direct Appeal**

On April 30, 2009, Martin, through counsel, filed a Notice of Appeal with the Court of Appeals for the Ninth Appellate District ("state appellate court.")  (ECF No. 6-1, Exh 7.)  The State moved to dismiss based upon lack of subject-matter jurisdiction as the trial court had not issued a final, appealable order. *Id.*, Exhs. 8-9.  Ultimately, the case was remanded for a new sentencing hearing. *Id.*, Exh. 11.  On January 6, 2010, Martin was again sentenced to an aggregate prison term of four years. *Id.*, Exh. 15.

On June 22, 2010, Martin, *pro se*, filed a Notice of Appeal raising two assignments of error as follows:

> 1.  The court erred by denying Donald Martin's Motion to Suppress and as such the trial court should be reversed.
>
> 2.  The court erred to the prejudice of Defendant's constitutional rights under the U.S.C.A. Const. Amend. 4, Const. Art. I § 14. The local authorities conducted an illegal search as such; the trial court should be reversed.

*Id.,* Exh. 20.[3]  On May 18, 2011, Martin's conviction was affirmed. *Id.*, Exh. 22.

On June 17, 2011, Martin, *pro se*, filed a Notice of Appeal with the Supreme Court of Ohio raising the following propositions of law:

> I.   The court of appeals erred by affirming Donald Martin's appeal from the trial courts denial of his rights under the Fourth Amendment of the United States Constitution and Section 14, Article I of the Ohio Constitution.
>
> II.  The court of appeals erred and prejudiced the Appellant's constitutional rights under the 4th Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution when local authorities conducted an illegal search as such; the trial court should have determined unconstitutionally conducted.

*Id.*, Exh. 23.  On October 5, 2011, the appeal was dismissed as not involving any substantial

---

his liberty must be severe and immediate, such as occurs when he is released subject to certain conditions and restrictions on parole, probation, or bail." *Lewis v. Randle*, 36 Fed. Appx. 779, 780-81 (6th Cir. 2002) (*quoting Maleng*, 490 U.S. at 491.)  Post-release control satisfies the "in custody" requirement.

[3]Martin's June 22, 2010 appeal was based upon the trial court's *nunc pro tunc* journal entry of May 25, 2010, issued after Martin's second appeal filed on February 24, 2010. *Id*., Exhs. 17, 18.

constitutional question. *Id*., Exh. 26.

**C.   Federal Habeas Petition**

On October 19, 2011, Martin filed his Petition for Writ of Habeas Corpus asserting the following grounds for relief:

> **GROUND ONE**: The court erred by denying Donald Martin's Motion to Suppress and as such the trial court should be reversed.
>
> **GROUND TWO**: The court erred to the prejudice of the Defendant's constitutional rights under the U.S.C.A. Const. Amend 4, Const. Art I. § 14. The local authorities conducted an illegal search as such, the trial court should be reversed.

(ECF No. 1.)

### III.  Review on the Merits

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254. *See Lindh v. Murphy*, 521 U.S. 320, 326-27, 337 (1997). The relevant provisions of AEDPA state:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Clearly established federal law is to be determined by the holdings of the United States Supreme Court. *See Parker v. Matthews,* 567 U.S. –, 2012 WL 2076341, *6 (U.S. Jun. 11, 2012); *Renico v Lett,* 559 U.S. –, 130 S.Ct. 1855, 1865-1866 (2010); *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005). However, an explicit statement by the Supreme Court is not mandatory; rather, "the legal principles and standards flowing from [Supreme Court] precedent" also qualify as "clearly established law." *Ruimveld*, 404 F.3d at 1010 (*quoting Taylor v. Withrow*, 288 F.3d 846, 852 (6th Cir. 2002)) The Supreme Court has indicated, however, that circuit precedent does not constitute "clearly established Federal law, as determined by the Supreme Court." *Parker*, 2012 WL 2076341, *6;

5

*Howes v. Walker,* – S.Ct. –, 2012 WL 508160 (U.S. Jun. 11, 2012).

A state court's decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. at 413. By contrast, a state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* However, a federal district court may not find a state court's decision unreasonable "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, a federal district court must determine whether the state court's decision constituted an objectively unreasonable application of federal law. *Id.* at 410-12. "This standard generally requires that federal courts defer to state-court decisions." *Strickland v. Pitcher*, 162 Fed. Appx. 511, 516 (6th Cir. 2006) (*citing Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998)).

In *Harrington v. Richter*, ––– U.S. ––––, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011), the Supreme Court held that as long as "fairminded jurists could disagree on the correctness of the state court's decision," relief is precluded under the AEDPA. *Id.* at 786 (internal quotation marks omitted). The Court admonished that a reviewing court may not "treat[ ] the reasonableness question as a test of its confidence in the result it would reach under *de novo* review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 785. The Court noted that Section 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal." *Id.* (internal quotation marks omitted). Therefore, a petitioner "must show that the state court's ruling ... was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786–87. This is a very high standard, which the Court readily acknowledges. *See id.* at 786 ("If this standard is difficult to meet, that is

6

because it is meant to be.")

**Grounds One and Two: Search of Martin's Home**

In ground one, Martin claims that the state courts improperly denied his Motion to Suppress. (ECF No. 1 at 2.) Ground two alleges that Martin's suppression hearing addressed only two issues: (1) whether the protective sweep was excessive and (2) the warrantless search itself. (ECF No. 11 at 2.) Martin states that "although a suppression hearing was had it did not properly address the issue of consent." *Id.* Specifically, Martin argues that the local authorities conducted an illegal search because his consent was given under duress. (ECF No. 1 at 2; ECF No. 11 at 1-4.) He also alleges that the police conduct was egregious. He asserts that the "officers engaged in tactics of coercion by threatening [his] family with arrest and removal to job and family services." (ECF No. 11 at 13.)

Respondent treated the Petition as raising a single ground concerning "the search of [Martin's] house and the trial court's subsequent finding that the evidence obtained during that search would be admissible at trial against Martin." (ECF No. 6 at 8.) Respondent asserts that this claim is not cognizable in federal habeas review. *Id.* at 8-9.

Generally, a writ of habeas corpus cannot be granted on the ground that a petitioner's Fourth Amendment rights were violated if the petitioner had an opportunity to present the Fourth Amendment claim in state courts. *See Stone v. Powell*, 428 U.S. 465, 494 (1976); *Wallace v. Kato*, 549 U.S. 384, 395 n. 5 (2007); *accord Ewing v. Ludwick*, 134 Fed. Appx. 907, 911 (6th Cir. 2005). The United States Supreme Court has held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone*, 428 U.S. at 494. The Sixth Circuit has found that the determination as to whether a petitioner has had "an opportunity for full and fair litigation of a Fourth Amendment claim" requires a federal district court to make two separate inquiries. *Riley v. Gray*, 674 F.2d 522, 526 (6th Cir. 1982) (citations omitted). First, the district court should ascertain "whether the state procedural mechanism, in the abstract, presents the opportunity to raise a fourth amendment claim." *Id.* Second, the district court must ascertain

"whether presentation of the claim was in fact frustrated because of a failure of that mechanism." *Id*.

Because the Sixth Circuit already has determined that "[t]he mechanism provided by the State of Ohio for the resolution of fourth amendment claims is . . . clearly adequate," this Court's role is confined to the second inquiry – namely whether presentation of the claim was in fact frustrated because of a failure of that mechanism. *Id*.; *accord Bridges v. Bradshaw*, 2006 U.S. Dist. LEXIS 96749 (N.D. Ohio Jan. 10, 2006).

The state appellate court concluded that the search was not unconstitutional and the motion to suppress was properly denied:

> {¶ 9} A motion to suppress evidence presents a mixed question of law and fact. *State v. Burnside,* 100 Ohio St. 3d 152, 2003-Ohio-5372, at ¶ 8. Generally, a reviewing court "must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Id.* But see *State v. Metcalf,* 9th Dist. No. 23600 2007-Ohio-4001, at 14 (Dickinson, J., concurring). The reviewing court "must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." Burnside, 2003-Ohio-5372, at ¶ 8.
>
> {¶ 10} The trial court found that the police responded to a burglary in progress with shots fired. It determined that, upon arriving at the scene, Sergeant Sunkin observed a broken window and believed that the shot had come from inside the house. Sergeant Sunkin did not hear Mr. Kelker say that there was no one else in the house and proceeded to conduct a "protective sweep." When he entered the basement, Sergeant Sunkin saw a padlocked enclosure with an exhaust fan and noticed a bright light and the smell of marijuana coming from it. The trial court further found that Officer Jackson saw marijuana plants growing inside the enclosure. It also found that Mr. Martin's testimony that threats were made against him was not credible. As the trial court based its findings on the testimony of Sergeant Sunkin, Detective Hudak, and Mr. Kelker, we accept the trial court's findings.
>
> {¶ 11} Mr. Martin's first assignment of error is that the trial court erred by denying his motion to suppress because the protective sweep of his home was unconstitutional. Warrantless searches of a home are presumptively unreasonable. Brigham City, *Utah v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004)). "Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Id.* "[W]arrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Id.* (quoting *Mincey v. Arizona*, 437 U.S. 385, 393–94 (1978)). "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Id.* (quoting *Mincey,* 437 U.S. at 392).

{¶ 12} This Court has previously recognized that an officer's reasonable belief that a burglary is in progress constitutes exigent circumstances that justify warrantless entry into a home. *State v. Mathis,* 9th Dist. No. 22039, 22040, 2004–Ohio–6749, at ¶ 36. In *Mathis,* an officer pursued a domestic violence suspect into a home, kicking in the door in the process. *Id.* at ¶ 4. A second officer arrived on the scene and proceeded to make a protective sweep of the house because he believed there was a burglary in progress. *Id.* at ¶ 6. This Court concluded that the officer's belief that a burglary was in progress was reasonable given that he had received an emergency call from an officer, an officer was arresting a suspect on the front lawn, the door of the house was broken in, another officer was unaccounted for, and he entered the home before the other officer explained the situation to him. *Id.* at ¶ 35.

{¶ 13} Sergeant Sunkin was specifically responding to a burglary with shots fired call. When he arrived at the house, he saw a window that appeared to have a bullet hole in it. Going around to the front, he saw officers arresting a teenager. He did not speak with the officers or the teen and proceeded inside with Officer Jackson to perform the sweep. Based on the facts known to Sergeant Sunkin, it was objectively reasonable for him to believe that there could be someone inside the house.

{¶ 14} Even if Sergeant Sunkin had heard the stepson say that he lived there and was alone, he had reason to search the house. The United States Supreme Court has held that a protective sweep is permissible if the officer "'possess[es] a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant [ ]" the officer in believing,' that the area swept harbored an individual posing a danger to the officer or others." *State v. Buie,* 494 U.S. 325, 327 (1990) (quoting *Michigan v. Long,* 463 U.S. 1032, 1049–50 (1983) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968))). We cannot say that officers must cease investigating a reported burglary with shots fired merely because an individual, especially one meeting the officers with a weapon, claims to be a resident of the house and that there is no one else inside. The sweep performed by Sergeant Sunkin and Officer Jackson did not exceed the scope of a permissible sweep under *State v. Buie,* 494 U.S. 325 (1990). Sergeant Sunkin testified that the enclosure was large enough to hold multiple people. He had Officer Jackson look through a gap in the door to check for people. When Officer Jackson only observed plants, they left the basement.

{¶ 15} Mr. Martin has argued that his case is similar to *State v. Walters,* 9th Dist. No. 23795, 2008–Ohio–1466. His situation, however, is different from the facts in *Walters.* In *Walters,* the Akron police received a report that a woman was being held against her will by the defendant. *Id.* at ¶ 2. Two officers investigating the report went to the defendant's home and asked his daughter if they could speak to the alleged victim. *Id.* When the alleged victim came outside, she denied being assaulted or held against her will. *Id.* The officers noticed that she appeared nervous and had bruises on her face. *Id.* at ¶ 3. They contacted dispatch and were told that the alleged victim had a protective order against the defendant. *Id.* They decided to arrest the defendant and entered the home when he refused to come outside. *Id.* After arresting the defendant, the officers performed a protective sweep. *Id.* at ¶ 4. When they came upon a padlocked door, they retrieved the key from the alleged victim, opened it, and discovered a methamphetamine lab in the basement. *Id.*

9

{¶ 16} This Court concluded that the officers had exceeded the scope of a permissible protective sweep. *State v. Walters,* 9th Dist. No. 23795, 2008–Ohio–1466, at ¶ 9. The Court noted that the alleged victim and the defendant's daughter both told the officers that the defendant was the only person inside the house. *Id.* at ¶ 12. Further, neither officer saw any indication that another person was in the house or that another victim could be in the basement. *Id.* at ¶ 13–14. Even the initial reason for the investigation, that a woman was being held against her will, was refuted by the alleged victim. *Id.* at ¶ 14. Additionally, this Court concluded that "as the basement was padlocked from the outside, officers could not have reasonably believed that anyone in the basement posed a danger to them." *Id.* at ¶ 15. Because the officers did not have a reasonable suspicion that someone in the basement posed a danger to them or that there was a victim in the basement, opening the padlocked enclosure exceeded the permissible scope of a protective sweep.

{¶ 17} Sergeant Sunkin performed the protective sweep in response to a burglary in progress with shots fired, which he interpreted as a "botched home invasion." He had observed evidence that led him to believe a shot had come from inside the house. There were particular, articulable facts giving rise to a reasonable suspicion that someone was inside the house that could pose a danger to the officers or who could need assistance.

{¶ 18} Further, Sergeant Sunkin never heard Mr. Kelker say he lived at the house, that he was alone, and that the burglar had fled. Even if he had, Mr. Kelker was a teenager who was at the house during school-hours and who greeted the police holding a weapon. Unlike in *State v. Walters,* 9th Dist. No. 23795, 2008–Ohio–1466, the police did not know Mr. Kelker's relationship to the crime being investigated, and they did not need to believe the uncorroborated statement of an unknown individual that no one remained in the house. In *Walters,* two people at the scene, one of whom the police knew was the alleged victim, stated that no one else was in the house. Their statements removed any reasonable suspicion the police had that victims could be in the basement, whereas nothing terminated Sergeant Sunkin's reasonable suspicion about possible victims or suspects inside the house.

{¶ 19} Mr. Martin has argued that, even if the protective sweep was permissible, Officer Jackson looking into the padlocked enclosure exceeded the scope of the sweep because any person that was inside the enclosure would have been locked inside and unable to harm the officers. He has pointed to the testimony of Detective Hudak that the enclosure only had one door, which was padlocked, and has argued that the situation is analogous to *State v. Walters,* 9th Dist. No. 23795, 2008–Ohio–1466, and United States v. Davis, 471 F.3d 938 (8th Cir.2006).

{¶ 20} This Court, in deciding *State v. Walters,* 9th Dist. No. 23795, 2008–Ohio–1466, did look to *United States v. Davis*, 471 F.3d 938 (8th Cir.2006). *Walters,* 2008–Ohio–1466, at ¶ 15. The Court in *Davis* concluded that an officer exceeded the permissible scope of a protective sweep by breaking the lock off a closet door as "nothing he observed indicated that anyone was hiding in the closet and that if someone were actually hiding inside, the individual would have been locked in the closet." *Id.* at 945. The situations in *Walters* and *Davis,* however, are not analogous to the sweep performed in Mr. Martin's house. In both cases Mr. Martin has cited, the protective sweep was performed incident to an

10

> arrest. In *Davis,* no argument was made that the officers were looking for victims, and, in *Walters,* this Court concluded the officers did not have a reasonable suspicion that other people were in the house. *Walters,* 2008–Ohio–1466, at ¶ 15. Further, in both instances, the officers unlocked, or broke the lock off, the only door to the enclosure or closet before they searched inside.
>
> {¶ 21} Mr. Martin's marijuana enclosure is a custom-made addition to his house. There was no reason for the officers to presume there was only one way in or out of the enclosure. Though it turned out that there was only one door, Sergeant Sunkin testified that, due to the clutter in the basement, he could not be sure of that at the time officer Jackson looked in it. In fact, he testified that the padlocked doorway was obscured by a big-screen television and that it took a few moments to locate it. The officers were also responding to a burglary in progress call, not effectuating an arrest, meaning that their sweep of the house included looking for victims, not just burglars. Accordingly, the mere fact that someone inside the enclosure would be locked in and pose no threat to the officers did not defeat the officer's interest in checking the enclosure for victims.
>
> {¶ 22} Given the totality of the circumstances, the protective sweep was reasonable for the officers to perform. It was limited to places a person could be; the officers did not open the kitchen cabinets for example. Once they were "reasonably sure" no one was in the house, they terminated the sweep. Accordingly, the trial court did not err by denying Mr. Martin's motion to suppress as the protective sweep did not constitute an unconstitutional search. His first assignment of error is overruled.
>
> {¶ 23} Mr. Martin's second assignment of error is that the search of his house was unconstitutional because his consent was not voluntary. He has argued that his case is analogous to *State v. Wildman,* 6th Dist. No. WD–08–061, 2009–Ohio–6986. In *Wildman,* the Court concluded that the defendants' consent to the search was not voluntary because it followed too closely after an illegal search. *Id.* at ¶ 22. As discussed above, however, the protective sweep was not illegal. Accordingly, Mr. Martin's consent was not tainted by a previous illegal search. His second assignment of error is overruled.
>
> {¶ 24} The protective sweep was a legal search of the house to ensure the safety of the officers and to check for burglars or potential victims, and Mr. Martin voluntarily consented to the subsequent search of his house.

*State v. Martin,* 2011 WL 2021913, *2-6 (Ohio App. 9th Dist. May 18, 2011).

At the state level, Martin was provided an opportunity to fully and fairly litigate his claim. His ability to present his Fourth Amendment claim was not frustrated through a failure in Ohio's review process. The arguments in Martin's Motion to Suppress focused on the protective sweep exceeding its scope and the unconstitutionality of a warrantless search. However, Martin was given an opportunity to cross-examine the state's witnesses and present evidence with respect to the issue of consent. (ECF No. 6-1, Exh. 3 and Exh. 27.) At the hearing, Martin raised the

11

consent issue during his opening statement, cross-examination of the State's second witness, his direct-examination, and closing statement.  While he did so only briefly, the State thoroughly addressed the consent issue during its portion of the hearing.

In his opening statement, Martin characterized his case as "the sole basis . . . [for the motion] is that . . . [the police officers] exceeded the scope of the protective sweep . . . and whether or not . . . Mr. Martin gave consent is irrelevant at that point in time . . . but for the exceeding the scope of the protective sweep, the officers would've never had any reason to ask for consent to search the home for drugs or to go and get a search warrant or to search his vehicle." *Id.* at 186-87.

On direct examination of the State's second witness, Matthew Hudak, a detective with the Barberton police department, testimony was elicited about the circumstances regarding Martin's consent to search, the details of the search, and the details about Martin's subsequent interview at the police station. *Id.* at 220-32.  The detective provided clear and positive testimony that the consent to search was voluntarily given.  On cross-examination, Martin's questioning focused on the typical scope of protective sweeps during burglary calls, the detective's involvement after the protective sweep of Martin's house, and details regarding the basement room where the marijuana plants were found. *Id.* at 232-28.  Very briefly, Martin questioned the detective about the consent issue:

> Q: "But it is your testimony that you got Mr. Martin's consent after sergeant Sunkin told you what he found in that room, correct?"
>
> A: "Yes."
>
> Mr. Sipplen: "No further questions, your honor."

*Id.* at 238.

On direct examination, Martin testified to the facts and circumstances surrounding his arrival home, the detective asking his consent to search the house, and the interview at the police station. *Id.* at 267-274.  Specifically, Martin testified that the detective told him if Martin did not sign the consent, his fifteen-year old daughter would also be charged with any drugs found in the home. *Id*. at 272.  Martin, in his closing argument, addressed the consent issue: "we respectfully

12

ask this Court to suppress everything that happened from the discovery of the marijuana plants and everything else afterwards, and invalidate the consent because it was not consensual, and it is 'fruit of the poisonous tree.'" *Id.* at 296.

Importantly, the trial court, in its order, characterized Martin's three contentions as the following: "[1] no exigent circumstances existed to allow the police to enter his home to conduct a protective sweep, . . . [2] the scope of any permissible protective sweep was exceeded and therefore, any subsequent consent to search given by Defendant was irrelevant because it was obtained using information impermissibly obtained, [and] . . . [3] consent was obtained by threat." *Id.* at 18.  After examining evidence and listening to testimony, the court denied Martin's motion. *Id.* at 22.  Specifically with respect to the issue of consent, the court found Martin's testimony unpersuasive and accepted the detective's version of events finding that the consent was voluntarily given without any duress or coercion. *Id.* at 18-19.  The trial court noted that Martin's testimony was unpersuasive as it was contrary to a subsequent recording at the police station on the day of the arrest in which Martin was jovial and agreed that he consented because he thought the police would just find "some weed." *Id*. at 19.

In conclusion, the trial court did indeed examine the issue of consent at the hearing.  The state appellate court thoroughly analyzed the issues, applied federal constitutional law, and concluded that the suppression motion was properly denied.  Lastly, Martin petitioned the Supreme Court of Ohio to review the state appellate court's ruling.  (ECF No. 6-1, Exh. 23.) Because Martin was provided an opportunity to fully and fairly present his claim in the state courts and because there was no failure in the review process, Martin's grounds for relief are not cognizable and are also without merit.

### IV.  Conclusion

For the foregoing reasons, it is recommended that Martin's Petition be DENIED.

                                                      s/ Greg White
                                                      United States Magistrate Judge

Date:  August 15, 2012

**OBJECTIONS**
Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).